UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

NAASÓN JOAQUÍN GARCÍA; ROSA SOSA; AZALIA RANGEL GARCÍA; EVA GARCÍA DE JOAQUÍN; JORAM NÚÑEZ JOAQUÍN; and SILEM GARCÍA PEÑA,

Defendants.

Case No. 25-CR-370 (LAP)

**EVA GARCÍA DE JOAQUÍN'S MEMORANDUM OF LAW IN REPLY TO THE GOVERNMENT'S OPPOSITION TO HER: (1) MOTION TO SEVER; (2) MOTION TO DISMISS, STRIKE, OR NARROW COUNT ONE TO THE EXTENT IT RELIES ON FOREIGN PREDICATE CONDUCT NOT INDICTABLE WHEN IT OCCURRED, AND TO PRECLUDE ANY RETROACTIVE USE OF 18 U.S.C. § 1596 AS A BASIS OF LIABILITY AGAINST HER; AND (3) MOTION TO STRIKE THE GOVERNMENT'S RELIANCE ON SPIRITUAL COERCION AS A BASIS FOR THE SEX-TRAFFICKING PREDICATES IN THE CONSPIRACY CHARGES**

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES** .......... iii

**INTRODUCTION** .......... 1

**SEVERANCE IS NECESSARY TO PROTECT MS. DE JOAQUÍN'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND AN INDIVIDUALIZED DETERMINATION OF GUILT** .......... 2

**I. The Government's Invocation of a RICO Conspiracy Does Not Cure the Absence of Individualized Facts Connecting Eva to the Alleged Enterprise After 2008.** .......... 2

**II. A Joint Trial Creates a Serious Risk That the Jury Will Convict Eva by Association Rather Than Proof Beyond a Reasonable Doubt.** .......... 5

**III. In Light of the Inevitable and Inescapable Prejudice, Severance is the Only Appropriate Remedy.** .......... 8

**FOREIGN PREDICATE CONDUCT NOT INDICTABLE WHEN IT OCCURRED IS AN IMPERMISSIBLE BASIS FOR LIABILITY FOR COUNT ONE IN THE INDICTMENT** .......... 10

**I. This Motion Presents a Question of Statutory Scope, Not a Dispute About Evidence.** .......... 10

**II. The Government Does Not Defend the Foreign Reach of Any Predicate.** .......... 12

**III. In Any Event, *Firtash* Declines to Follow the Second Circuit Rule Ms. de Joaquín's Motion Applies.** .......... 13

**IV. Conspiracy Allegations Do Not Convert Unindictable Foreign Conduct into Racketeering Activity.** .......... 15

**V. The Government Has Abandoned Reliance on Foreign Conduct Predating December 23, 2008.** .......... 16

**VI. The Government Is Silent, for a Third Time, on the Territorial and Timing Particulars. ........ 18**

**VII. The Rule the Government Asks This Court to Adopt Has No Stopping Point. ...... 18**

**VIII. Dismissal of Count One is Not an Extraordinary Remedy. ........ 19**

**SPIRITUAL COERCION IS A LEGALLY UNTENABLE BASIS TO MAINTAIN THE GOVERNMENT'S CONSPIRACY CHARGES PREDICATED ON SEX TRAFFICKING AGAINST MS. DE JOAQUÍN ........ 21**

**I. The Government's Opposition Misunderstands Ms. de Joaquín's "Spiritual Coercion" Argument. ........ 21**

**II. The Government's Papers Reveal That It Ultimately Abandons its "Coercion" Argument in Favor of the Other Alleged Statutory Means for Sex Trafficking. .. 23**

**III. This Court Should Grant the Narrow and Appropriate Relief Ms. de Joaquín Seeks. ........ 25**

**CONCLUSION ........ 26**

## TABLE OF AUTHORITIES

### Cases

*Adhikari v. Kellogg Brown & Root, Inc.*,
845 F.3d 184 (5th Cir. 2017) .......... 17

*Bascuñán v. Elsaca*,
927 F.3d 108 (2d Cir. 2019) .......... 12

*Emp. Div., Dev't of Human Res. of Ore. v. Smith*,
494 U.S. 872 (1990) .......... 21

*Kotteakos v. United States*,
328 U.S. 750 (1946) .......... 8

*Krulewitch v. United States*,
336 U.S. 440 (1949) .......... 6

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) .......... 17

*RJR Nabisco, Inc. v. European Cmty.*,
579 U.S. 325 (2016) .......... passim

*Salinas v. United States*,
522 U.S. 52 (1997) .......... 3, 15

*United States v. Applins*,
637 F.3d 59 (2d Cir. 2011) .......... 15

*United States v. Attanasio*,
870 F.2d 809 (2d Cir. 1989) .......... 4

*United States v. Ballard*,
322 U.S. 78 (1944) .......... 23, 24, 25

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) .......... 18

*United States v. DiNome*,
954 F.2d 839 (2d Cir. 1992) .......... 4

*United States v. Firtash*,
392 F. Supp. 3d 872 (N.D. Ill. 2019) .......... 13, 14, 17

*United States v. Frey*,
736 F. Supp. 3d 128 (E.D.N.Y. 2024) ........ 21

*United States v. Gallo*,
668 F. Supp. 736 (E.D.N.Y. 1987) ........ 3

*United States v. Glecier*,
923 F.2d 496 (7th Cir. 1991) ........ 14

*United States v. Hawit*,
No. 15-CR-252-PKC, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ........ 14

*United States v. Hoskins*,
902 F.3d 69 (2d Cir. 2018) ........ 12, 13, 14, 16

*United States v. Innamorati*,
996 F.2d 456 (1st Cir. 1993) ........ 8

*United States v. Iossifov*,
45 F.4th 899 (6th Cir. 2022) ........ 14

*United States v. Jordan*,
629 F. Supp. 3d 49 (E.D.N.Y. 2022) ........ 3, 5

*United States v. Martínez*,
994 F.3d 1 (1st Cir. 2021) ........ 7, 8

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000) ........ 18

*United States v. Nusraty*,
867 F.2d 759 (2d Cir. 1989) ........ 4

*United States v. Rittweger*,
524 F.3d 171 (2d Cir. 2008) ........ 3

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998) ........ 3

*United States v. Sampson*,
898 F.3d 270 (2d Cir. 2018) ........ 10, 11

*United States v. Skinner*,
70 F.4th 219 (4th Cir. 2023) ........ 12

*United States v. Spinelli*,
352 F.3d 48 (2d Cir. 2003) .......... 6

*United States v. Wedd*,
993 F.3d 104 (2d Cir. 2021) .......... 11

*United States v. Weingarten*,
632 F.3d 60 (2d Cir. 2011) .......... 12

*Zafiro v. United States*,
506 U.S. 534 (1993) .......... 7

**Statutes**

18 U.S.C. § 7 .......... 17

18 U.S.C. § 1589 .......... 11

18 U.S.C. § 1591 .......... 11, 22

18 U.S.C. § 1596 .......... 16, 17

18 U.S.C. § 1961 .......... 19

18 U.S.C. § 1962 .......... 16

18 U.S.C. § 2251 .......... 12

18 U.S.C. § 2423 .......... 12

18 U.S.C. § 3271 .......... 17

Fed. R. Crim. P. 8 .......... 2, 4, 5

Fed. R. Crim. P. 12 .......... 11

Fed. R. Crim. P. 14 .......... 2, 5, 6

## INTRODUCTION

The government's opposition attempts a leviathan bluff on this Court: it declines to meaningfully respond to Ms. de Joaquín's cogent arguments while obscuring the points at issue. The government best betrays this strategy by declining to engage in the predicate-by-predicate analysis this Circuit's jurisprudence requires when a defendant raises an extraterritoriality challenge. In so doing, the government concedes the merits of Ms. de Joaquín's position.

Further, the government's entire response to Ms. de Joaquín's severance argument is *ipse dixit:* this a conspiracy case. This bare declaration does little to rebut or cure the irreparable prejudice Ms. de Joaquín identifies in her motion. While conspiracy cases give the government more leeway, they do not exempt the government from pleading specific facts connecting a defendant to the alleged conspiracy. Finally, the government's opposition to Ms. de Joaquín's "spiritual coercion" argument is a red herring misdirecting the Court to jurisprudence Ms. de Joaquín never challenges.

In this Reply to the government's opposition, Ms. de Joaquín demonstrates that the law supports the Court's grant of her motion in its entirety.

## SEVERANCE IS NECESSARY TO PROTECT MS. DE JOAQUÍN'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND AN INDIVIDUALIZED DETERMINATION OF GUILT

The government's opposition confirms the defect Ms. de Joaquín identified in her initial motion: it incants "conspiracy" as some magic substitute for facts to permit conviction of Ms. de Joaquín for conduct wholly unrelated to her. While a RICO conspiracy count may provide a formal vehicle for joinder, it does not relieve the government of its pleading obligations to allege individualized facts supporting the conclusion that Ms. de Joaquín knowingly agreed to join the alleged enterprise. Nor does the label "conspiracy" weave a spell that relieves this Court from analyzing whether joinder was proper or whether declining to sever the case will result in irreparable prejudice to Ms. de Joaquín. Ms. de Joaquín's motion and this Reply establish the need for relief as contemplated by Rule 14; only severance can guarantee Eva Garcia de Joaquín's constitutional right to a fair trial.

### I. The Government's Invocation of a RICO Conspiracy Does Not Cure the Absence of Individualized Facts Connecting Eva to the Alleged Enterprise After 2008.

The government's central assertion betrays its fundamental weakness: it claims that the RICO conspiracy count alone satisfies Rule 8(b) and forecloses severance under Rule 14.[1] The government's contention is incorrect for the simple reason that the indictment offers no facts to support the conclusion that Ms. de Joaquín knowingly agreed to join the charged conspiracy. The government's cited authorities presuppose individualized conduct tying Ms. de Joaquín to the charged conspiracy; they do not hold that joinder is proper when the government identifies no acts, statements, or participation during the relevant period.[2]

[1] Opp. at 31–32.
[2] *See infra* pp. 4.

Nobody denies that a RICO conspiracy charge broadens the basis for joinder.[3] The government may join multiple defendants if it alleges that they participated in the same racketeering enterprise or conspiracy, even when it charges different defendants with different acts, so long as the indictment connects those acts as racketeering predicates or acts undertaken in furtherance of a commonly charged RICO enterprise.[4] The key point is that the government's allegations *must* tie the defendant to the conspiracy through specific conduct.[5] Here, the government fails to do that.

The government's cited authorities involved defendants linked to a common criminal plan by individualized evidence. In *Rittweger*, the indictment alleged overlapping facts and participants that unified two conspiracies involving fraudulent investment products, including members who participated in both schemes.[6] In *Salameh*, joinder was proper because the evidence tied the objecting defendant directly to the same terrorist conspiracy; identical publications recovered from his own residence linked him to materials seized from a co-defendant.[7]

*Salinas* likewise offers no help to the government. A RICO conspirator need not personally commit each predicate act, but the government still must prove that the defendant agreed to further the enterprise's criminal objective and the government must plead facts demonstrating that agreement, or, conduct evincing an agreement.[8] These cases share the critical basis permitting broader joinder (and demonstrate its absence in Ms. de Joaquín's case):

---

[3] *United States v. Gallo*, 668 F. Supp. 736, 747 (E.D.N.Y. 1987).
[4] *Id.*
[5] *United States v. Jordan*, 629 F. Supp. 3d 49, 59 (E.D.N.Y. 2022).
[6] *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008).
[7] *United States v. Salameh*, 152 F.3d 88, 114–115 (2d Cir. 1998).
[8] *Salinas v. United States*, 522 U.S. 52, 65 (1997).

individualized facts reflecting the defendant's joining and participating in the charged conspiracy.

The indictment alleges no post-2008 act, statement, communication, instruction, or agreement by Ms. de Joaquín linking her to the alleged abuse, coercion, or enterprise conduct. Instead, the government points to the conspiracy's alleged benefit to the Joaquín family, including Ms. de Joaquín. But benefit alone does not establish agreement, participation, knowledge, or foreseeability.[9] Family association, presence, or status does not establish the knowing agreement required for conspiracy liability.[10] For proper joinder, there must be some common mucilage or activity between an objecting defendant and the other indictees;[11] there is no such glue here.

The government's dismissal of Ms. de Joaquín's reliance on *United States v. DiNome* underscores the gap in its argument. Although the government attempts to distinguish *DiNome* in a footnote, its distinction fails for its misdirection; the government focuses on the fact that the severed defendants were not named in the racketeering count while overlooking the Court's different rationale for severance.[12] It was the "mass of irrelevant evidence"—including vicious murders, loansharking, auto theft, pornography, and firearms trafficking—that required severance.[13] That is the Circuit's teaching this Court should heed.

---

[9] *See* Opp. at 31.
[10] *United States v. Nusraty*, 867 F.2d 759, 764 (2d Cir. 1989).
[11] *See United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989) (finding that Rule 8(b) requires acts to be "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme") (internal quotations omitted).
[12] Opp. at 33.
[13] *United States v. DiNome*, 954 F.2d 839, 843–44 (2d Cir. 1992).

The government will introduce what will amount to weeks of trial evidence involving sexual abuse and coercion allegations against Naasón and others without identifying facts showing Ms. de Joaquín's knowing participation in any of that. The government will do so under the guise of the "conspiracy" despite identifying no facts that Ms. de Joaquín joined it.

The propriety of joinder under Rule 8(b) turns on the indictment's allegations,[14] not on what the government expects its evidence to show at trial.[15] The government's focus on anticipated evidence rather than the indictment disregards this longstanding rule.[16] Because the government makes no effort to direct the Court to any specific indictment allegation supporting a common plan or scheme connecting Ms. de Joaquín to the post-2008 conduct, this Court should sever Ms. de Joaquín's trial.

## II. A Joint Trial Creates a Serious Risk That the Jury Will Convict Eva by Association Rather Than Proof Beyond a Reasonable Doubt.

Even if Rule 8(b) permitted joinder, Rule 14 warrants severance because a joint trial presents a substantial threat to Ms. de Joaquín's right to a reliable, individualized verdict. The government concedes the applicable standard: Ms. de Joaquín must show prejudice so severe that it would deny her a constitutionally fair trial, either by compromising a specific trial right or by preventing the jury from making a reliable judgment about guilt or innocence. The government's own authorities recognize that severance is the remedy when the disparity in proof creates overwhelming spillover prejudice.[17] As the Second Circuit explained, there are cases in which "the sheer volume and magnitude of the evidence against one defendant so dwarfs the

[14] *United States v. Jordan*, 629 F. Supp. 3d 49, 59 (E.D.N.Y. 2022).
[15] *Id.* ("The Government's focus on evidence, rather than the Indictment, disregards all together the longstanding rule that in assessing the propriety of joinder, district courts are to look only at the facts alleged in an indictment.").
[16] *Id.*
[17] Opp. at 29–30.

proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice."[18] This is such a case.

The government's evidence against Naasón and others concerns highly inflammatory sexual-abuse and coercion allegations that the government has not tied to Ms. de Joaquín through individualized proof. Much of that evidence would not be admissible against Ms. de Joaquín simply because it bears no relevance to her alleged conduct. The government disagrees, claiming that the evidence would be admissible against Ms. de Joaquín because conspiracy evidence that is admissible against one defendant is admissible as to all defendants. The government's admissibility theory is circular: it treats Ms. de Joaquín as a conspirator first (despite the government's pleading failures), then uses that assumption to admit the conspiracy evidence against her.

Moreover, limiting instructions cannot cure the resulting prejudice to Ms. de Joaquín in a joint trial. Justice Jackson recognized long ago that the assumption that juries can reliably disregard prejudicial evidence by instruction is often an "unmitigated fiction."[19] That concern applies with special force here, where the jury would be asked to compartmentalize weeks of evidence against other defendants from a narrow and thinly pleaded theory against Ms. de Joaquín. The government treats this as an ordinary joint conspiracy trial, but limiting instructions fail when the volume, breadth, and emotionally-charged nature of the evidence make it unrealistic for the jury to compartmentalize the evidence defendant-by-defendant. A joint trial here creates precisely the kind of guilt-by-association risk Rule 14 exists to prevent.

---

[18] *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).
[19] *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring).

"When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary," and less drastic measures such as limiting instructions often will not suffice.[20] This was the case in *Martínez*, another conspiracy case which supports severance here.[21] In *Martínez*, the First Circuit vacated Ms. Martínez's convictions because the joint trial "exposed [the jury] to days of detailed [corruption] evidence" against a co-defendant that would not have been admissible in a separate trial for her.[22] The same danger lurks here. The government seeks to expose Ms. de Joaquín to highly inflammatory sexual-abuse allegations against Naasón and others that have nothing to do with Ms. de Joaquín's alleged conduct.

*Martínez* also shows why the disparity in proof matters. In *Martínez*, the government had direct evidence of the co-defendant's corrupt intent, but only circumstantial evidence against the appellant.[23] That mismatch created a serious risk that the jury would impute one defendant's state of mind to another. The same risk drives Ms. de Joaquín's severance motion. The government lacks individualized, direct proof that she knowingly joined the charged conspiracy. We know this because the government alleges no facts that demonstrate the existence of such evidence.

The government instead tries to use family status and inflammatory evidence against others to fill that gap. Limiting instructions did not solve the problem in *Martínez* (and they will fail here too). The First Circuit held that the instructions could not cure the prejudice because the joint trial allowed the government to present damaging evidence of a distinct scheme and

---

[20] *Zafiro v. United States*, 506 U.S. 534, 539 (1993).
[21] *United States v. Martínez*, 994 F.3d 1 (1st Cir. 2021).
[22] *Id.* at 14.
[23] *Id.* at 16.

repeatedly blur the lines between defendants.[24] That reasoning applies with equal force for Ms. de Joaquín.

The government would likely not attempt to introduce evidence involving Naasón or other alleged perpetrators in Ms. de Joaquín's severed trial. A jury would reasonably ask what such evidence, like facts concerning Naasón's conviction in the State of California, has to do with allegations against her. The government *wants* the benefit of improper association and jury confusion. The government knows that if it had to factually prove the allegations against Ms. de Joaquín based on her own alleged conduct alone, it would fail.

Judicial economy cannot override Ms. de Joaquín's right to a fair trial. Efficiency matters only *after* the Court determines that joinder will not undermine fairness and reliability. The government cannot justify exposing Ms. de Joaquín to weeks of evidence focused on others merely because a separate trial would be less convenient (which, as we pointed out in our affirmative motion, it would not be).

## III. In Light of the Inevitable and Inescapable Prejudice, Severance is the Only Appropriate Remedy.

The government has not identified facts showing Ms. de Joaquín's knowing participation in the charged conspiracy after 2008. A joint trial would create an unacceptable risk that the jury will convict Ms. de Joaquín by association. The government's opposition overlooks the absence of individualized facts tying

---

[24] *Id.* at 15–16. "[P]rejudice from being tried jointly 'can come in various forms, including jury confusion, the impact of evidence that is admissible against only some defendants, and 'spillover' effects where the crimes of some defendants are more horrific or better documented than the crimes of others.' And, we are persuaded that this is the rare case in which '[t]he dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, [were] so great' as to require severance." *Id.* at 14 (quoting *United States v. Innamorati*, 996 F.2d 456, 469 (1st Cir. 1993); *Kotteakos v. United States*, 328 U.S. 750, 774 (1946)).

Ms. de Joaquín to post-2008 conduct and treats limiting instructions as a cure-all for a structurally prejudicial trial. This Court should grant Ms. de Joaquín's motion to sever her trial from Naasón and the other defendants to protect her constitutional right to a fair trial.

**FOREIGN PREDICATE CONDUCT NOT INDICTABLE WHEN IT OCCURRED IS AN IMPERMISSIBLE BASIS FOR LIABILITY FOR COUNT ONE IN THE INDICTMENT**

Ms. de Joaquín's motion asks one simple question: can the government rely on foreign conduct in its indictment against Ms. de Joaquín where the government does not cite a single statute that reaches foreign conduct at the time of the alleged conduct? The government does not answer this question. It instead offers a thin four pages that essentially avoids responding to a thirty-one-page predicate-by-predicate analysis.[25] The government identifies neither statute nor subsection that reaches abroad, and no foreign act that was indictable when committed. Rather, the government claims the question is premature, and points to five paragraphs of the Indictment it calls "classically domestic conduct."[26] One of those paragraphs describes the enterprise as a whole. One does not mention Ms. de Joaquín. The remaining three name her only inside a string reciting four defendants together, without a date, a victim, or an act attributable to her.[27] In sum, the government concedes Ms. de Joaquín's motion.

**I. This Motion Presents a Question of Statutory Scope, Not a Dispute About Evidence.**

The parties agree that a court may not resolve dispositive fact-based evidentiary disputes on a motion to dismiss.[28] Ms. de Joaquín does not ask the Court to depart from that rule. The two cases the government invokes for that unchallenged standard share the feature that defeats the government's reliance on them. Each case involved a question the court could not answer *without facts*. *Sampson* turned on when a defendant formed "fraudulent intent," an obvious fact

[25] Opp. at 16–19.
[26] *Id.* at 17.
[27] Indictment ¶¶ 15, 24(b), 24(d), 24(f), 24(g).
[28] Opp. at 4.

question as an element of the offense.[29] And *Wedd* turned on whether conceded domestic conduct amounted to a "use of a means of identification"—another clear question of fact.[30] Neither involved whether a statute reached the place where the conduct occurred—a question of law. A dispute about what a defendant intended, or about what a statutory term means as applied to admitted domestic acts, is not a dispute about a statute's territorial scope.

*Sampson* affirmatively identifies the category into which this motion falls. A defense may be established on a Rule 12(b) motion where it is "clear from the face of the indictment."[31] And Rule 12 permits pretrial resolution where "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense."[32] This motion presents precisely that circumstance. Ms. de Joaquín does not ask this Court to resolve any factual issue. Rather, whether (1) Congress extended Sections 1591 and 1589 beyond United States borders before December 23, 2008, and (2) the Mann Act provisions, the child-exploitation provisions, the bank-fraud statute, and the currency provisions reach foreign conduct are questions of law resolved by the Court determining the scope of the United States Code and the public laws that amended it.[33] No quantum of evidence would aid the Court in resolving this issue.

---

[29] *United States v. Sampson*, 898 F.3d 270, 278–79 (2d Cir. 2018) (vacating pretrial dismissal where the district court resolved the factual question of when the defendant formed fraudulent intent).
[30] *United States v. Wedd*, 993 F.3d 104, 120–21 (2d Cir. 2021) (declining to decide before trial whether the alleged conduct amounted to a "use" of a means of identification, holding that at the indictment stage, courts do not evaluate the adequacy of the facts to satisfy the elements of the charged offense).
[31] *Sampson*, 898 F.3d at 279.
[32] *Id.* at 282.
[33] Mot. at 33 & nn.129–30.

Relatedly, the government misplaces its prematurity objection. A prematurity objection requires resolution of a factual dispute, and the government identifies none. It does not say which acts it attributes to Ms. de Joaquín, when those occurred, or where, nor has it explained why any such dispute must be deferred. Having twice declined to answer those questions, the government cannot now argue that the answers must await trial.

## II. The Government Does Not Defend the Foreign Reach of Any Predicate.

Ms. de Joaquín's motion applied the two-step framework of *RJR Nabisco* to every predicate family identified in Paragraph 25, statute by statute and subsection by subsection.[34] The opposition answers none of them. It simply declares it "unnecessary to engage now" with those claims and then does not.[35] Importantly, the government nowhere contends that *any* listed predicate reaches foreign conduct.

Likewise, the government passes over compelling authorities. *Weingarten* holds that travel between two foreign countries is not "travel in foreign commerce" under Section 2423(b), and the Second Circuit reversed a conviction on that ground.[36] *Bascuñán* holds that the bank fraud statute "does not purport to apply to extraterritorial conduct."[37] *Skinner* sustained a conviction, but only after locating the focus of Section 2251(a) in the production or transmission of the visual depiction rather than in the sexually explicit conduct, and finding that the production had occurred in Virginia.[38] Critically, a domestic application of the statute requires the production or transmission itself to occur domestically. And *Hoskins* holds that an ancillary

---

[34] Mot. at 30–42.
[35] Opp. at 17.
[36] *United States v. Weingarten*, 632 F.3d 60, 66, 70–71 (2d Cir. 2011) (reversing conviction; travel between two foreign countries is not "travel in foreign commerce" under 18 U.S.C. § 2423(b)).
[37] *Bascuñán v. Elsaca*, 927 F.3d 108, 124 (2d Cir. 2019).
[38] *United States v. Skinner*, 70 F.4th 219, 222–24, 226 (4th Cir. 2023) (*per curiam*).

offense reaches abroad no further than the statute underlying it.[39] Each case bears directly on whether the foreign conduct alleged here was indictable. The government nevertheless ignores them in full.

For the proposition that the question must wait, the government relies on a single out-of-circuit decision, *United States v. Firtash*.[40] *Firtash* does not support the government's argument because *Firtash* performed the very analysis the government calls premature, and that Ms. de Joaquín conducted here. *Firtash* held the Money Laundering Control Act extraterritorial by statute,[41] held that "[t]he Travel Act does not have extraterritorial reach,"[42] and sustained the Travel Act predicate only as a domestic application resting on two identified trips on two identified dates.[43] It did so on a motion to dismiss, observing that deference to the grand jury "must be reconciled with the longstanding principle that 'in general, United States law governs domestically but does not rule the world.'"[44]

The government has therefore left every predicate undefended. By declining to defend any, it effectively concedes that none reach the foreign conduct on which Count One depends.

## III. In Any Event, *Firtash* Declines to Follow the Second Circuit Rule Ms. de Joaquín's Motion Applies.

*Firtash* could not carry the government's argument even had it reserved the extraterritoriality question. It is a district court decision from the Northern District of Illinois that applied Seventh Circuit law. It declined to follow *United States v. Hoskins*—Second Circuit

[39] *United States v. Hoskins*, 902 F.3d 69, 96–97 (2d Cir. 2018) (the extraterritorial reach of an ancillary offense is coterminous with that of the underlying statute).
[40] Opp. at 17.
[41] *United States v. Firtash*, 392 F. Supp. 3d 872, 886–87 (N.D. Ill. 2019).
[42] *Id.* at 887.
[43] *Id.* at 888.
[44] *Id.* at 882 (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016)).

precedent—on the ground that the Second Circuit's reasoning rested on legislative history analysis "that the Seventh Circuit ha[d] summarily determined is unreliable."[45]

*Hoskins* holds that the extraterritorial reach of an ancillary offense such as conspiracy or aiding and abetting is coterminous with that of the underlying statute.[46] That rule binds this Court, and it is the rule on which Part III.A of Ms. de Joaquín's omnibus motion rests.[47] The government therefore asks this Court to follow a decision whose reasoning depends on rejecting controlling precedent in this Circuit. A district court in Illinois is free to prefer Seventh Circuit law. This Court is not.

*Firtash* also rests on *Glecier* for the proposition that a racketeering conspiracy indictment need not list predicate acts at all.[48] That reasoning has no purchase here for a reason independent of any disagreement among the circuits: this Indictment does enumerate its predicates in Paragraph 25. "Where a criminal defendant is charged for foreign conduct under the RICO statute, the Court **must** determine whether 'the predicate[] alleged . . . appl[ies] extraterritorially.'"[49] Courts thus work through each charged predicate to decide which one, if any, reached the defendant's foreign conduct.[50] *RJR Nabisco* frames the inquiry the same way, limiting RICO's foreign reach to "the predicates alleged in a particular case."[51]

---

[45] *Firtash*, 392 F. Supp. 3d at 892.
[46] *Hoskins*, 902 F.3d at 96–97.
[47] Mot. at 30–32.
[48] *United States v. Glecier*, 923 F.2d 496, 501 (7th Cir. 1991); *Firtash*, 392 F. Supp. 3d at 885–86.
[49] *United States v. Iossifov*, 45 F.4th 899, 912 (6th Cir. 2022) (emphasis added).
[50] *See*, *e.g.*, *United States v. Hawit*, No. 15-CR-252-PKC, 2017 WL 663542, at *10 (E.D.N.Y. Feb. 17, 2017).
[51] *RJR Nabisco*, 579 U.S. at 339.

## IV. Conspiracy Allegations Do Not Convert Unindictable Foreign Conduct into Racketeering Activity.

The government responds that the Indictment "charges multiple instances of classically domestic conduct," citing five paragraphs.[52] Those paragraphs do not do the work the government assigns them. Paragraph 15 describes where the enterprise operated but attributes no specific act to any individual.[53] Paragraphs 24(b), 24(d), and 24(g) name Ms. de Joaquín only inside strings reciting four defendants together, without a date, a victim, or an act attributable to her.[54] Paragraph 24(f) does not name her at all.[55]

The government answers that this is a conspiracy, and that each alleged conspirator is responsible for the reasonably foreseeable acts of the others. Ms. de Joaquín agrees with that principle in the abstract.[56] But that principle does not answer this motion for two independent reasons.

*First*, *Salinas* addresses who must commit a racketeering act. *RJR Nabisco* addresses what counts as one. Ms. de Joaquín does not contend that the government must allege a racketeering act she committed herself; *Salinas* holds otherwise, and her motion has never argued that.[57] But a RICO conspiracy still requires an agreement that the defendant (or another member of the conspiracy) commit at least two racketeering acts, and it is sufficient only where the defendants "agreed to the commission of multiple violations of a specific statutory provision that qualifies as RICO racketeering activity."[58] The jury must be unanimous as to the type of

---

[52] Opp. at 17 (citing Indictment ¶¶ 15, 24(b), 24(d), 24(f), 24(g)).
[53] Indictment ¶ 15.
[54] *Id.* ¶¶ 24(b), 24(d), 24(g).
[55] *Id.* ¶ 24(f).
[56] *Salinas*, 522 U.S. at 62–65 (1997) (a RICO conspirator need not personally commit or agree to commit any predicate act).
[57] Mot. at 30–32.
[58] *United States v. Applins*, 637 F.3d 59, 81–82 (2d Cir. 2011).

racketeering activity agreed to, each type defined by a listed statute.[59] An act is racketeering activity only if it was indictable under one of those statutes, and "conduct committed abroad is not 'indictable' under [a] statute" that does not reach abroad.[60] An agreement that a conspirator would commit a listed offense in a place the statute never reached is therefore not an agreement to commit racketeering activity at all. It is an agreement to engage in conduct the statute did not forbid, and the government can charge no conspirator with agreeing to a crime that did not exist where and when the conduct occurred.

*Second*, the conspiracy charge does not extend territorial reach. The extraterritorial reach of an ancillary offense is coterminous with that of the underlying statute, and *RJR Nabisco* assumed that Section 1962(d)'s reach tracks the provision underlying the alleged conspiracy.[61] Section 1962(d) reaches no further abroad than the predicates it incorporates. That an alleged conspirator committed an indictable domestic act does not convert a foreign act of a different alleged conspirator into racketeering activity where no statute reached that foreign conduct.

## V. The Government Has Abandoned Reliance on Foreign Conduct Predating December 23, 2008.

Before December 23, 2008, no statute conferred federal jurisdiction over trafficking or forced-labor offenses committed abroad, apart from two narrow provisions that do not apply here. Section 1596, enacted that day, supplied that jurisdiction going forward. The government's entire response on the point is one sentence, resting Ms. de Joaquín's exposure on instances that "occurred after 2008 (when Congress passed 18 U.S.C. § 1596)."[62]

---

[59] *Id.*
[60] *RJR Nabisco*, 579 U.S. at 339.
[61] *Hoskins*, 902 F.3d at 96–97; *see RJR Nabisco*, 579 U.S. at 341.
[62] Opp. at 17.

That sentence concedes the motion too. A party that defends its statute only as applied to post-enactment conduct has accepted that the statute does not reach conduct completed before enactment. The argument turns on statutory history, the enactment, and amendment dates of the provisions themselves, not on legislative history. The government does not argue retroactivity. It does not address *Landgraf*.[63] It does not address *Adhikari*.[64] It does not address the *Ex Post Facto* Clause. And it does not respond to the two pre-2008 jurisdictional provisions the motion identified and showed to be inapplicable here.[65]

The live dispute has narrowed to a single allegation. Of the three paragraphs the government cites,[66] only one names Ms. de Joaquín: an April 2017 instance in the Central District of California involving Victim-6, pleaded in the Notice of Special Sentencing Factors as attaching to the liability of two other defendants.[67] That allegation is domestic on its face, which confirms that the government has identified no foreign act it defends as indictable.

Holding the government to the theory its papers state is what *Firtash* itself did, looking past the indictment to the government's pleadings where there was "a credible disagreement over what conduct the government is criminally charging, or whether that conduct falls within the extraterritorial scope of a statute."[68] This Court should likewise hold the government to the theory in its papers.

---

[63] *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269–70, 280 (1994) (absent a clear congressional command, a statute does not govern conduct completed before enactment where it would attach new legal consequences to that conduct).
[64] *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 198 (5th Cir. 2017) (applying § 1596 to pre-2008 conduct would have an impermissible retroactive effect; rejecting the argument that the provision merely clarified existing law).
[65] 18 U.S.C. §§ 7(9), 3271; Mot. at 46–47.
[66] Indictment ¶¶ 27–29.
[67] *Id.* ¶ 28.
[68] *Firtash*, 392 F. Supp. 3d at 883.

## VI. The Government Is Silent, for a Third Time, on the Territorial and Timing Particulars.

For the third time, the government has not said where or when Ms. de Joaquín's alleged acts occurred. She asked the government to identify, for each act attributed to her, whether it occurred outside the United States, whether it occurred before or after December 23, 2008, and the jurisdictional basis on which it was indictable when committed.[69] The government declined without addressing those requests.[70] Its opposition does not address them either.

The particulars section of the government opposition answers venue, commercial sex acts, and coercion, and promises an enterprise letter and Jencks Act material, but it never states that any disclosure will identify where and when her alleged acts occurred.[71] The government confuses volume for particularity and fails to meaningfully distinguish *Bortnovsky*[72] or *Nachamie*.[73] In effect, the government's response to Ms. de Joaquín's motion is that the answers she seeks are somewhere in the production.

## VII. The Rule the Government Asks This Court to Adopt Has No Stopping Point.

The government's position is that the Court should let Count One proceed as pleaded and take up the extraterritorial reach of the predicates, if at all, after trial.[74] What would it mean to accept that position for a charge spanning fifty-five years? Three consequences follow, and each is a reason the Court should decline the government's invitation.

---

[69] Mot. Ex. B at 4–5.
[70] Mot. Ex. D.
[71] Opp. at 23–27.
[72] *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (the government does not fulfill its obligation "merely by providing mountains of documents to defense counsel who were left unguided").
[73] *United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (ordering particulars notwithstanding a production exceeding 200,000 pages).
[74] Opp. at 17.

*First*, the word Congress chose stops doing work. RICO reaches acts "indictable" under a listed statute.[75] If foreign conduct qualifies without any showing that a listed statute reached it, the charge itself satisfies the requirement of indictability, and the limit Congress wrote becomes unenforceable at the only stage where it can be enforced.

*Second*, a pleading alone would displace the presumption against extraterritoriality. *RJR Nabisco* requires predicate by predicate analysis. A rule permitting the government to answer that analysis with silence, and with conduct attributed to a group, would let any indictment carry any foreign conduct into a racketeering charge so long as some conspirator did something here.

*Third*, and most concretely, a person would stand trial in 2026 for conduct that was not a federal crime anywhere when she engaged in it. Ms. de Joaquín lived in Mexico throughout the period in which the government alleges her individualized conduct, and she relocated to the United States only after 2014.[76] The rule the government defends would attach federal criminal consequences to that conduct decades later, by force of a statute enacted afterward. That is the harm the *Ex Post Facto* Clause exists to prevent, and deferring the question to trial does not cure it.

Requiring the government to identify a predicate that reached the conduct it charges asks nothing unusual. It asks the government to say which law Ms. de Joaquín broke, where, and when.

**VIII. Dismissal of Count One is Not an Extraordinary Remedy.**

The questions this motion asks have been available to the government since January. Which statute reached the conduct? Which subsection supplied that reach? When did it take

[75] 18 U.S.C. § 1961(1).
[76] Def. Bail Opp., ECF No. 41, at 5.

effect? In two letters and a brief, the government has answered none of them. It instead asks the Court to defer the question to a trial where the same silence will do the same work.

Congress wrote the limit into the statute. Racketeering activity is conduct indictable under a listed law, and a law that never reached Mexico cannot make conduct in Mexico indictable. The Court should enforce that limit now, while it can still be enforced.

The Court should thus enter an order (1) dismissing or striking Count One as to Ms. de Joaquín to the extent it rests on foreign predicate conduct that was not indictable under a listed statute when and where it occurred, and on trafficking or forced-labor conduct predating December 23, 2008; (2) in the alternative, narrowing Count One to exclude that conduct and the corresponding portions of the agreement allegation in Paragraph 26, and directing that conduct so excluded may not be presented to the jury, used to establish the pattern or the agreement, or used at sentencing or for forfeiture; and (3) in the further alternative, directing the government to file the bill of particulars set out in Exhibit E to Ms. de Joaquín's motion.[77]

[77] Mot. Ex. E.

## SPIRITUAL COERCION IS A LEGALLY UNTENABLE BASIS TO MAINTAIN THE GOVERNMENT'S CONSPIRACY CHARGES PREDICATED ON SEX TRAFFICKING AGAINST MS. DE JOAQUÍN

### I. The Government's Opposition Misunderstands Ms. de Joaquín's "Spiritual Coercion" Argument.

The government opposes Ms. de Joaquín's argument by curiously citing and describing legal principles not at issue. Ms. de Joaquín agrees religious beliefs provide no defense for criminal conduct of general applicability.[78] Ms. de Joaquín's argument, however, does not depend on this proposition.[79]

The sincerity of the alleged victims' religious beliefs is, contrary to the opposition, central to the government's coercion theory, and its pleading burden makes that clear. For the government's coercion theory to survive, it must plead that a defendant "(1) knowingly recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], advertise[d], maintain[ed], patronize[d], or solicit[ed] [her] victim; and (2) d[id] so while knowing[ly] or recklessly disregarding that force, threats of force, fraud, coercion, or any combination of such means would be used to cause [her] victim to engage in a commercial sex act."[80] Coercion is relevant to the second element, and is one of several means that the government can allege Ms. de Joaquín used to compel a victim to engage in a commercial sex act.

Congress specifically defined the term "coercion" as follows: "'coercion[]' means[:] (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious

---

[78] *See* Opp. at 8 (citing *Emp. Div., Dev't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 878 (1990)).
[79] The government chides the defendants for not engaging with this body of case law, which it also cited in its grand jury transcripts briefing. Opp. at 9. But these cases are not relevant to Ms. de Joaquín's argument.
[80] *United States v. Frey*, 736 F. Supp. 3d 128, 143 (E.D.N.Y. 2024).

harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process."[81] Subsection (C) is not at issue here, particularly with respect to Ms. de Joaquín; the government did not allege any coercion related to abuse of law or the legal process. Therefore, for the indictment to have properly alleged coercion as a means of compulsion, the government must have pled facts sufficient to satisfy subsections (A) and (B) of 18 U.S.C. § 1591(e)(2).

In Ms. de Joaquín's motion, she detailed several instances in which the government alleged coercion based *only* on purported corruption of LLDM doctrine or the withholding of blessings from the Apostle.[82] And, as Ms. de Joaquín pointed out, the government's allegations never get any more specific than broad and conclusory allegations like members of the LLDM Joaquín Enterprise "maintained control over the victims *by manipulating and abusing the culture of the LLDM church, which taught absolute obedience and devotion to the Apostle*."[83] The government does not explain (either in the indictment or the opposition) how these allegations satisfy the statutory language and qualify as "threats of serious harm" or "physical restraint against any person" under 18 U.S.C. § 1591(e)(2)(A), (B). In fact, the government deliberately avoids answering that question in its opposition.

The reason is obvious: such alleged conduct can only qualify as a "threat of serious harm" if, for example, corrupting LLDM doctrine or "abusing the culture of the LLDM church" is threatening. But by itself, it is not. And the government knows that. The government also knows that any perceived threatening effect necessarily depends on the sincerity or truth of one's belief in the doctrine or teachings of the church.

---

[81] 18 U.S.C. § 1591(e)(2).
[82] Mot. at 57–58 (citing Indictment).
[83] *See, e.g.*, Indictment ¶ 24(c) (emphasis added).

To put a fine point on it: if someone truly believed that she would not receive a blessing if she refused to engage in directed conduct, then perhaps the direction itself could have had a threatening effect. If, on the other hand, she was atheist, there is clearly no "threatening" effect as envisaged by the statute because the consequence of failing to follow the direction would be meaningless. In that way, the government's "spiritual coercion" allegations necessarily depend on the sincerity or truth of the alleged victim's beliefs. And as *Ballard* and its progeny teach, such an inquiry is impermissible.[84] Therefore, this Court must strike each one of the indictment's allegations that depends only on "spiritual coercion."

## II. The Government's Papers Reveal That It Ultimately Abandons its "Coercion" Argument in Favor of the Other Alleged Statutory Means for Sex Trafficking.

Close scrutiny of the government's opposition and the government's grand jury transcripts briefing shows that the government always falls back on its other alleged theories when confronted with the unconstitutionality of "spiritual coercion." In so doing, it tries to improperly save coercion as a properly alleged theory by commingling it with the other statutory grounds. This approach is no savior for the government's improper coercion theory.

In its grand jury briefing papers and in response to Mr. García's "spiritual coercion" challenge, the government responds that "the [i]ndictment alleges multiple alternative theories of liability that do not depend on the conduct that Naasón terms 'spiritual coercion.'"[85] The government elaborated that those alternatives include allegations that Naasón and his co-conspirators compelled victims to participate in commercial sex acts through "physical force,"

---

[84] *United States v. Ballard*, 322 U.S. 78, 87 (1944) (If religious doctrines which may "seem incredible, if not preposterous," "are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain.").
[85] ECF No. 54 at 8.

"restraint[s]," "threats of force," and threats to end the victims' "relationship with [their] family members or friends inside the LLDM Church."[86]

The government's opposition confirms its concession and ultimate reliance on its other theories. The opposition explains: "[t]he objective truth of the defendants' religious beliefs is not at issue at all in this case—what matters to the adult sex trafficking charges is what the victims believed about the consequences of failing to submit to the defendants' directives and how the defendants used those beliefs to threaten the victims with 'physical,' 'nonphysical,' or 'psychological . . . harm' that was sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform. . . "[87] In other words, the victims' beliefs beget the harm.

The first part of this claim confesses that the alleged victims' sincerity in their beliefs is integral to the government's theory, which is an inquiry *Ballard* bars. The second part of this claim introduces threats of physical harm and supposed nonphysical harm but does not explain how Ms. de Joaquín could have harmed any of the alleged victims based on mere claims that the Apostle would not bless them. The government presumes the "threatening" nature of its "spiritual coercion" allegations; something it cannot do. The indictment must contain affirmative allegations of threatening conduct. Here, it does not, which is fatal to those allegations.

Later in its opposition, understanding the untenability of its argument, the government reiterates what it explained in its grand jury papers: "the Indictment alleges multiple alternative theories of liability that do not depend on the coercion conduct that the defendants claim the First

---

[86] *Id.*
[87] Opp. at 9–10.

Amendment protects."[88] In other words, the government ultimately falls back on the alleged theories that Ms. de Joaquín does not challenge—it concedes Ms. de Joaquín's argument.

To be clear, Ms. de Joaquín agrees that the alternative theories survive at this stage, and she remains prepared to vigorously challenge them at trial on the merits. However, this Court must strike allegations based only on "spiritual coercion" claims or theories.

## III. This Court Should Grant the Narrow and Appropriate Relief Ms. de Joaquín Seeks.

A proper understanding of the body of law at issue leads to one conclusion: the government's allegations of compulsion *via* "spiritual coercion" alone cannot stand. The government's best efforts to conflate its theories do not change this outcome. The only allegation against Ms. de Joaquín that is not premised solely on spiritual coercion is the allegation that Ms. de Joaquín held down one alleged victim as Samuel allegedly raped her.[89] Though she denies this, Ms. de Joaquín acknowledges that this factual allegation properly fits within the government's other theories, including use of force. She is prepared to show the falsity of this allegation at trial. All other allegations against Ms. de Joaquín run afoul of *Ballard* and its progeny and this Court should strike those allegations from the indictment for the reasons provided in her omnibus motion and in this Reply.

---

[88] Opp. at 11.
[89] Indictment ¶ 10.

## CONCLUSION

For the above reasons, this Court should grant Ms. de Joaquín's motion in its entirety and order the appropriate relief. Specifically, this Court should: (1) sever Ms. de Joaquín's trial; (2) dismiss Count One in its entirety or otherwise narrow it to exclude the alleged extraterritorial conduct and the corresponding portions of the agreement allegation in Paragraph 26; and (3) strike all allegations in the indictment premised on the government's improper "spiritual coercion" theory.

Dated: September 11, 2026
New York, New York

ChaudhryLaw PLLC

By: */s/ Priya Chaudhry*
Priya Chaudhry
Justin Mungai

147 West 25th Street, 12th Floor
New York, New York 10001
Tel: (212) 785-5550

priya@chaudhrylaw.com
justin@chaudhrylaw.com

*Attorneys for Eva García de Joaquín*